UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
─────────────────────────────────

THERESA M. SPENCER,

               Plaintiff,

v.                                  **DECISION AND ORDER**
                                            06-CV-160S

ARIZONA PREMIUM FINANCE CO., INC.,

               Defendant.
─────────────────────────────────

## I. INTRODUCTION

Plaintiff, Theresa Spencer, alleges that Defendant, Arizona Premium Finance Co., Inc. ("Arizona"), violated the Credit Repair Organization Act, 15 U.S.C. §§ 1679, et seq. ("Credit Act"), the Telephone Consumer Protection Act, 47 U.S.C. § 227 ("Telephone Act"), and New York's General Business Law § 349 ("GBL § 349"). Spencer further alleges that Arizona is liable for intentional infliction of emotional distress.[1] Presently before this Court is Arizona's motion to dismiss each of Spencer's claims.(Docket No. 22). For the following reasons, Arizona's motion is granted.

## II. BACKGROUND

**A.    Facts**

Much of the relevant background in this case is disputed. According to Theresa Spencer, on January 12th and August 2nd of 2004, she contracted for automobile insurance with All American Insurance ("All American"). (Plaintiff's Second Amended Complaint ¶ 22; Docket No. 21.) On both occasions, she financed this insurance through Arizona, an insurance premium finance company. (Id. ¶ 23.) For its part, Arizona states

---

[1] Jurisdiction is proper under 28 U.S.C. §§ 1331 and 1332.

that it has three accounts bearing the name "Theresa Spencer." (Rosenblum Affidavit ¶ 3; Docket No. 22-2.) Arizona has an account for a "Theresa Spencer" located in Landsdown, Pennsylvania, and two accounts for a "Theresa Spencer" located in Franklinville, New York. (Id.) Spencer states that she lives in Franklinville and that she has never resided in Pennsylvania. (Spencer Affidavit ¶¶ 2-3.)

In any event, Spencer claims that, at the latest, she cancelled and fully paid all of the premiums on both of her policies with All American as of May 30, 2005. (Plaintiff's Second Amended Complaint ¶ 28.) However, about a month later, in June of 2005, she alleges that she began to receive pre-recorded calls on her home telephone[2] from Arizona, indicating that she was delinquent on her obligation to Arizona, that her delinquency had been reported to credit bureaus, and that to repair her credit, she should pay her debt. (Id. ¶ 29.) All the messages were substantially similar to the following:

> This is a recorded message from Arizona Premiums concerning the cancellation of your car insurance. After cancellation [a] balance remains of $55.71. Since there has been no reply to our letters, this balance has been reported to the credit bureau. To repair your credit, do not avoid this check. It continues to grow until paid. You may call 602-992-9898 Monday through Friday, 9 AM to 7 PM Eastern time. Visit our website at www.arizonapremiums.com. Protect your credit by paying $55.71 today.

(Plaintiff's Call Transcripts; Docket No. 24-8.)

Spencer claims she took several steps to stop the calls, including calling Arizona, calling her insurance agent, and personally visiting her insurance agent. (Id. ¶ 32-34.) Yet,

---

[2]Phone number: 716-676-5744. Arizona admits that this is the number associated with the second "Spencer" account in Franklinville. However, it claims that their records show that there is no balance on this account and that no phone calls were made to this number.

according to Spencer, the calls did not stop until this litigation was commenced on March 16, 2006. She claims to have received approximately 1,000 phone calls from Arizona in the meantime. (Id. ¶ 31.)

Although Arizona admits that it uses a computer system to place phone calls to customers with outstanding balances, it denies every other allegation and maintains the following: it keeps thorough records of the all calls it makes to customers; it made only seven calls to the account based in Landsdown, Pennsylvania; it made no calls to the other two "Spencer" accounts. (Rosenblum Affidavit ¶ 4-5.) Further, Arizona asserts that it received a call from a man identifying himself as Spencer's stepfather on March 30, 2005. He indicated that she no longer lived at that address and requested that the calls stop. (Id. ¶ 5.) With that, Arizona claims, it deleted the number from their system and made no further calls. (Id.)

**B.   Procedural History**

Spencer commenced this action on March 16, 2006 by filing a complaint in this Court. (Docket No. 1.) She filed an Amended Complaint on June 5, 2006, and pursuant to Leave granted by this Court (Docket No. 20), filed a Second Amended Complaint on December 30, 2008. (Docket No. 21.) In granting Spencer Leave to File her Second Amended Complaint, this Court also denied Arizona's previous Motion to Dismiss (Docket No. 13) as moot.

### III. DISCUSSION

**A.   Legal Standard**

Rule 12 (b)(6) allows dismissal of a complaint for "failure to state a claim upon which

relief can be granted." Fed. R. Civ. P. 12 (b)(6).  Federal pleading standards are generally not stringent: Rule 8 requires only a short and plain statement of a claim.  Fed. R. Civ. P. 8 (a)(2).  But the plain statement must "possess enough heft to show that the pleader is entitled to relief."  Bell Atl. Corp. v. Twombly, 550 U.S. 544, 127 S.Ct. 1955, 1966, 167 L.Ed.2d 929 (2007).

When determining whether a complaint states a claim, the court must construe it liberally, accept all factual allegations as true, and draw all reasonable inferences in the plaintiff's favor.  ATSI Commc'ns, Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 98 (2d Cir. 2007).  Legal conclusions, however, are not afforded the same presumption of truthfulness.  See Ashcroft v. Iqbal, 556 U.S. __, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009) ("The tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions.").

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  Iqbal, 129 S.Ct. at 1945 (quoting Twombly, 550 U.S. at 570).  Labels, conclusions, or a "formulaic recitation of the elements of a cause of action will not do."  Twombly, 550 U.S. at 555. Facial plausibility exists when the facts alleged allow for a reasonable inference that the defendant is liable for the misconduct charged.  Iqbal, 129 S.Ct. at 1949. The plausibility standard is not, however, a probability requirement: the pleading must show, not merely allege, that the pleader is entitled to relief.  Id. at 1950; Fed. R. Civ. P. 8 (a)(2).  Well-pleaded allegations must nudge the claim "across the line from conceivable to plausible." Twombly, 550 U.S. at 570.

Courts therefore use a two-pronged approach to examine the sufficiency of a complaint, which includes "any documents that are either incorporated into the complaint by reference or attached to the complaint as exhibits." Blue Tree Hotels Inv. (Can.), Ltd. v. Starwood Hotels & Resorts Worldwide, Inc., 369 F.3d 212, 217 (2d Cir. 2004). This examination is context specific and requires that the court draw on its judicial experience and common sense. Iqbal, 129 S.Ct. at 1950. First, statements that are not entitled to the presumption of truth — such as conclusory allegations, labels, and legal conclusions — are identified and stripped away. See Iqbal, 129 S.Ct. at 1950. Second, well-pleaded, non-conclusory factual allegations are presumed true and examined to determine whether they "plausibly give rise to an entitlement to relief." Id.

**B.    Arizona's Motion to Dismiss**

Arizona moves to dismiss Spencer's complaint, arguing that it is not a credit repair organization and, as a result, the Credit Act does not govern its actions. It further argues that it complied with the Telephone Act and, in any event, is exempt from its provisions. Finally, it argues that it did not violate GBL § 349 and that Spencer's intentional infliction of emotional distress claim is legally deficient.

    **1.    Credit Repair Organization Act**

Spencer places emphasis on the portion of Arizona's message that encourages Spencer to pay her debt in order to repair her credit – "To repair your credit, do not avoid this check" – characterizing it as an offer to repair her credit. (See Plaintiff's Call Transcripts.) Next, she claims that Arizona never reported any debt to a credit reporting agency and, therefore, any payment that she made would, in fact, have no effect on her

credit score. Such misrepresentation, Spencer claims, violates the Credit Act. Spencer also claims that Arizona charged Spencer for services before performing them and failed to make certain disclosures, both in violation of the Credit Act.

The Credit Act's purpose is: "(1) to ensure that prospective buyers of the services of credit repair organizations are provided with the information necessary to make an informed decision regarding the purchase of such services; and (2) to protect the public from unfair or deceptive advertising and business practices by credit repair organizations." 15 U.S.C. § 1679(b)(1-2). As its name and its purpose imply, the Credit Act only applies to so-called "credit repair organizations." The term "credit repair organization":

> (A) means any person who uses any instrumentality of interstate commerce or the mails to sell, provide, or perform (or represent that such person can or will sell, provide, or perform) any service, in return for the payment of money or other valuable consideration, for the express or implied purpose of--
>
>   (i) improving any consumer's credit record, credit history, or credit rating; or
>   (ii) providing advice or assistance to any consumer with regard to any activity or service described in clause (i).

15 U.S.C. § 1679(a)(3)(A)(i)-(ii)

Spencer does not dispute that Arizona is an insurance premium finance company, but she argues that it should also be considered a credit repair organization because it offered to repair her credit score. In support of this position, Spencer cites a series of cases where entities such as banks, car dealerships, and law firms were all treated by the courts as credit repair organizations. However, all these entities have at least one thing in common distinguishing them from Arizona: in addition to their main business, they offered some credit repair services. The law firm contracted with a consumer for credit repair

7

services. Iosello v. Lexington Law Firm, No. 03 Civ. 987, 2003 WL 21920237 (Aug. 7, 2003 N.D. Ill.). The bank allegedly engaged in a fraud or deception "in connection with sale of the services of a credit repair organization." Vance v. Nat'l Benefit Ass'n, No. 99 Civ. 2627, 1999 WL 731764 (Aug. 30, 1999 N.D. Ill.). The car dealership advertised that it could "restore your credit." Parker v. 1-800 Bar None, No. 01 Civ. 4488, 2002 WL 215530 (Feb. 12, 2002 N.D. Ill.)

Arizona, conversely, is merely a creditor seeking repayment of a debt.[3] The only sensible interpretation of Arizona's message is that it used the potential of a lower credit score as motivation to encourage Spencer to pay the debt that it believed she owed. Arizona was clearly not offering a "service, in return for the payment of money or other valuable consideration, for the express or implied purpose of improving a consumer's credit record." See 15 U.S.C. § 1679O(a)(3)(A)(i). Instead, Arizona was merely asking Spencer to fulfill her obligation under their agreement and any increase to her credit score would simply have been an indirect, collateral effect to the settlement of her debt.

The plain language of the statute, underlined by its stated purpose, makes it clear that the Credit Act is not aimed at this type of activity. In fact, the Credit Act expressly exempts creditors from its reach. See 15 U.S.C. § 1679(3)(B)(ii) ("The term 'credit repair organization' . . . does not include . . .any creditor (as defined in section 1602[4] of this title),

---

[3] Spencer admits that Arizona is a creditor. (Second Amended Complaint ¶ 12.)

[4] 15 U.S.C. § 1602(f): "The term 'creditor' refers only to a person who both (1) regularly extends, whether in connection with loans, sales of property or services, or otherwise, consumer credit which is payable by agreement in more than four installments or for which the payment of a finance charge is or may be required, and (2) is the person to whom the debt arising from the consumer credit transaction is initially payable on the face of the evidence of indebtedness or, if there is no such evidence of indebtedness, by agreement. Notwithstanding the preceding sentence, in the case of an open-end credit plan involving a credit card, the card issuer and any person who honors the credit card and offers a discount which is a finance

8

with respect to any consumer, to the extent the creditor is assisting the consumer to restructure any debt owed by the consumer to the creditor."). As such, the Credit Act does not apply to Arizona and it cannot be held liable under it. Even assuming all allegations as true, as this Court must, Spencer fails to state a cause of action under the Credit Act. Consequently, Arizona's motion to dismiss this claim is granted.[5]

### 2. Telephone Consumer Protection Act

Spencer alleges that Arizona violated the Telephone Act by making pre-recorded calls to her home. The Telephone Act instructs the Federal Communications Commission ("FCC") to promulgate regulations "concerning the need to protect residential telephone subscribers' privacy rights to avoid receiving telephone solicitations to which they object." 47 U.S.C. § 227(c)(1). In relevant part, the Telephone Act reads:

> It shall be unlawful . . . to initiate any telephone call to any residential telephone line using artificial or prerecorded voice to deliver a message without the prior express consent of the called party, unless the call . . . is exempted by the rule or

---

charge are creditors. For the purpose of the requirements imposed under part D of this subchapter and sections 1637(a)(5), 1637(a)(6), 1637(a)(7), 1637(b)(1), 1637(b)(2), 1637(b)(3), 1637(b)(8), and 1637(b)(10) of this title, the term 'creditor' shall also include card issuers whether or not the amount due is payable by agreement in more than four installments or the payment of a finance charge is or may be required, and the Board shall, by regulation, apply these requirements to such card issuers, to the extent appropriate, even though the requirements are by their terms applicable only to creditors offering open-end credit plans. Any person who originates 2 or more mortgages referred to in subsection (aa) of this section in any 12-month period or any person who originates 1 or more such mortgages through a mortgage broker shall be considered to be a creditor for purposes of this subchapter. The term 'creditor' includes a private educational lender (as that term is defined in section 1650 of this title) for purposes of this subchapter.

[5]Despite this Court's finding that Arizona is not a credit repair organization, Spencer claims that Arizona can still be held liable under the Credit Act – specifically under § 1679(b) – because the language there prohibits certain acts by "persons," and is not limited to "credit repair organizations." However, the specific subsections that Spencer alleges were violated each prohibit acts only by credit repair organizations. See 15 U.S.C. 1679(b)(3)-(4). For example, "subsection (b)(4)" prohibits fraud and deception, but it does so "in connection with the offer or sale of the services of the credit repair organization." 15 U.S.C. 1679(b)(4). Because Arizona had no connection with credit repair services, this section is inapplicable.

9

> order of the [Federal Communications Commission] under paragraph 2(b).

47 U.S.C § 227(b)(1)(A)-(B)

The statute continues under the above-mentioned Section (2):

> The Commission shall prescribe regulations to implement the requirements of this subsection. In implementing the requirements of this subsection, the [Federal Communications Commission] . . . may, by rule or order, exempt from the requirements of paragraph 1B of this subsection, subject to such conditions as the commission may prescribe –
> (i) calls that are not made for a commercial purpose; and
> (ii) such classes or categories of calls made for commercial purposes as the commission determines –
> (I) will not adversely effect the privacy rights that this section is intended to protect; and
> (II) do not include the transmission of any unsolicited advertising.

47 U.S.C § 227(b)(2)(A)-(b)(II).

In turn, the relevant regulation, the authority of which derives from the Telephone Act, reads:

> No person may . . . [i]nitiate any telephone call to any residential line using an artificial or prerecorded voice to deliver a message without the prior express consent of the called party, unless the call;
> (i) Is made for emergency purposes;
> (ii) Is not made for a commercial purpose;
> (iii) Is made for a commercial purpose but does not include or introduce an unsolicited advertisement or constitute a telephone solicitation;
> (iv) Is made to any person with whom the caller has an established business relationship at the time the call is made.

47 C.F.R. § 64.1200(a)(1)-(2)(iv).

Piecing these statutes together, and reading them in conjunction reveals that the Telephone Act is not violated in two important and relevant scenarios: (1) when the pre-

recorded call is made for a commercial purpose, but does not include an unsolicited advertisement or solicitation; and (2) when the pre-recorded call is made to a person with whom the caller has a business relationship.

It is clear from the nature of these calls that Arizona intended to collect – what it believed to be – an outstanding debt from Spencer. Undoubtedly, then, it had a "commercial purpose." Equally clear is the absence of any advertisement or solicitation in the calls – Arizona was not offering any services or pushing any product. Therefore, under the plain language of "subsection (iii)" of the regulation, Arizona did not violate the Telephone Act. See 47 C.F.R. § 64.1200(a)(2)(iii).

Moreover, the purpose of the Telephone Act is to restrain telemarketers, not creditors, from making unsolicited, automated calls. As the background to the Senate Report indicates, "The use of automated equipment to engage in *telemarketing* is generating an increasing number of consumer complaints." S. Rep. No. 102-178, at 1 (1991), reprinted in 1991 U.S.C.C.A.N. 1968, 1968 (emphasis added). With this in mind, it becomes evident that the exceptions carved out by the FCC are intended to prevent the statute from casting too wide a net. Thus, to hold Arizona liable under the Telephone Act would strip away these protections and contravene its purpose.

Such a conclusion aligns with the FCC's Reports and Orders on this subject. See, e.g., In the Matter of Rules and Regulations Implementing the Tel. Consumer Prot. Act of 1991, 7 F.C.C.R. 8752, 8773 ¶ 39 (1992). ("[W]e conclude that an express exemption from the [Telephone Act's] prohibitions for debt collection calls is unnecessary because such calls are adequately covered by exemptions we are adopting here . . . pre-recorded debt collection calls would be exempt from the prohibitions on such calls to residences as: (1)

11

calls from a party with whom the consumer has an established business relationship, and (2) commercial calls which do not adversely affect privacy rights and which do not transmit an unsolicited advertisement.")

Spencer, however, argues that because she had paid off all her debt, any business relationship that she once had with Arizona was now discontinued and therefore Arizona cannot claim the exemption. In support of this proposition, Spencer relies on Watson v. NCO Group Inc., 462 F. Supp. 2d 641 (E.D. Pa. 2006), where the plaintiff claimed that the defendant violated the Telephone Act by making more than 200 automated calls to the plaintiff's residential telephone in a five month period, attempting to collect a debt that he did not owe. Considering the FCC's findings, the Watson court noted, "Defendants overlook the fact that the FCC made this pronouncement under the assumption that debt collection calls would be made only to debtors (i.e. those with an established business relationship)." Id. at 644-45. The court ultimately concluded that the exemption did not apply because: (1) an erroneously called non-debtor has no prior or existing business relationship; and (2) the calls adversely affected his privacy rights, even though the calls contained no advertisement or solicitation. Id.

As an initial matter, unlike Spencer, Watson never had a business relationship with the defendant, NCO. This is an important distinction since the FCC Report, *supra*, notes that "telemarketers will not violate our rules by calling a number which was provided as one at which the called party wishes to be reached." 7 F.C.C.R. at 8769, ¶ 31. Watson had just moved into a new residence (with an accompanying new telephone number) and had no connection with NCO, while Spencer had a prior contractual relationship with Arizona and presumably provided her number to Arizona as part of their finance agreement.

Further, "the district court's holding in Watson that the FCC reached its conclusion without considering the privacy rights of non-debtors fails to accord appropriate judicial deference to agency rules and orders made in accordance with the Telephone Act's clear congressional authorization." Santino v. NCO Fin. Sys., Inc., No. 09 Civ. 982, 2011 WL 754874 at *5 (Feb. 24, 2011 W.D.N.Y.) (citing United States v. Mead Corp., 533 U.S. 218, 229, 121 S.Ct. 2164, 150 L.Ed.2d 292 (2001) (express congressional authorization to engage in rulemaking or adjudication is a "very good indicator" of delegation warranting judicial deference).

The Santino court also observed that several decisions disagree with the court's finding in Watson. 2011 WL 754874, * 5. These decisions conclude that "subsection (iii)" exempts calls to non-debtors. Id.[6] Based on this analysis, even if Spencer had terminated her business relationship with Arizona, she cannot claim a Telephone Act violation. Accordingly, this Court dismisses Spencer's claim as a matter of law.

### 3.     Intentional Infliction of Emotional Distress

To sustain a cause of action for intentional infliction of emotional distress, a plaintiff must plead, among other elements, that she was the victim of "extreme and outrageous conduct." Howell v. New York Post Co., 81 N.Y.2d 115, 121, 596 N.Y.S.2d 350 (1993). The requirements of this rule are "rigorous, and difficult to satisfy." Id. (citing William Prosser

---

[6]Meadows v. Franklin Collection Service, Inc., 2010 WL 2605048, at *6 (June 25, 2010 N.D.Ala.) (FCC's determination that all debt collection circumstances are excluded from TCPA's coverage is broad enough to cover debt collection calls to non-debtor), aff'd in relevant part, 2011 WL 479997 (Feb.11, 2011 11th Cir.); Pugliese v. Professional Recovery Service, Inc., 2010 WL 2632562, at *7 (June 29, 2010 E.D.Mi.) (automated debt collection calls made to plaintiffs' residential telephone line are exempt from the TCPA's requirements) (citing Bates v. I.C. Systems, Inc., 2009 WL 3459740, *1 (W.D.N.Y., Oct.19, 2009) ("[D]ebt collection calls made to a residential line are exempt from the TCPA.")).

& W. Page Keeton, Torts, § 12, 60-61 (5th ed. 1984)). "Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." Howell, 81 N.Y.2d at 121 (quoting Murphy v. American Home Prods. Corp., 58 N.Y.2d 293, 303, 448 N.E.2d 86, 461 N.Y.S.2d 232 (1983).

Spencer alleges no facts that Arizona's conduct was extreme and outrageous. Even if Arizona intentionally misled Spencer about the existence of a debt, this behavior cannot be called "atrocious" or "utterly intolerable." See Howell, 81 N.Y.2d at 121. Spencer was not physically threatened, verbally abused, or publicly humiliated in any manner. See Conboy v. AT&T Corp., 241 F.3d 242, 258-59 (2d Cir. 2001). Even assuming Spencer's allegations as true, they fail as a matter of law. Id. (finding that plaintiffs stated no claim for intentional infliction of emotional distress where they were harassed with numerous phone calls from debt collectors). Therefore, this claim must be dismissed.

### 4. General Business Law § 349

GBL § 349 is a New York State consumer protection statute making deceptive acts or practices in the conduct of business unlawful. To state a claim under GBL § 349, a plaintiff must allege that: (1) the act or practice was consumer-oriented; (2) the act or practice was misleading in a material respect; and (3) the plaintiff was injured as a result. Spagnola v. Chubb Corp., 574 F.3d 64, 74 (2d Cir. 2009). "'Deceptive practices' are acts which are dishonest or misleading in a material respect." Id. "'Deceptive acts' are defined objectively . . . as acts likely to mislead a reasonable consumer acting reasonably under the circumstances." Id.

"The conduct need not be repetitive or recurring but defendant's acts or practices

must have a broad impact on consumers at large; [p]rivate contract disputes unique to the parties would not fall within the ambit of the statute." New York Univ. v. Continental Ins. Co., 87 N.Y.2d 308, 320, 662 N.E.2d 763, 639 N.Y.S.2d 283 (1995)

Spencer alleges, "Upon information and belief, Defendant has made representations identical or similar to those made to Plaintiff as alleged in this complaint to many other consumers at large in this district, the state of New York, and elsewhere." (Plaintiff's Second Amended Complaint ¶ 67.) However, such an allegation is nothing more than a general legal conclusion; it provides no concrete facts from which this Court could infer a scheme with broad impact or injury to consumers at large. Because "formulaic recitation of the elements of a cause of action will not do" and Spencer's pleading merely alleges, and does not show, that she is entitled to relief, she has failed to state a claim upon which relief can be granted. See Twombly, 550 U.S. at 555; see also Iqbal, 129 S.Ct. at 1949. In other words, Spencer has not sufficiently demonstrated that Arizona's alleged deceptive acts or practices are consumer-oriented within the meaning of the statute. See New York Univ., 87 N.Y.2d at 320. As such, Arizona's motion to dismiss is granted.

## IV. CONCLUSION

For the reasons discussed above, Arizona's Motion to Dismiss is granted regarding each cause of action.

## V. ORDERS

IT HEREBY IS ORDERED, that Defendant's Motion to Dismiss (Docket No. 22) is GRANTED.

FURTHER, that the Clerk of the Court is directed to close this case.


Dated:    September 24, 2011
          Buffalo, New York

                                              /s/William M. Skretny
                                          WILLIAM M. SKRETNY
                                               Chief Judge
                                         United States District Court